ROBERT R. POWELL, SBN 159747
SARAH E. MARINHO, SBN 293690
**POWELL & ASSOCIATES**
925 W. Hedding Street
San Jose, CA 95126
T: (408) 553-0201
F: (408) 553-0203
E: smarinho@rrpassociates.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
(San Jose Division)

| | |
|---|---|
| ANDREW LEE JOHNSON, | Case No. |
| Plaintiff, | |
| vs. | COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND DAMAGES |
| COUNTY OF SANTA CLARA; DEPUTY RUBAN; MATTHEW REEVES; DEPUTY DOMINGUEZ; JEREH LUBRIN; JONATHAN BENSON; CITY OF SAN JOSE; MARCO MONZON; JAMIE LEE NICHOLAS HALL; TRENT TESSLER; DOES 1-25, inclusive, | JURY TRIAL DEMANDED |
| Defendants. | |

**NATURE OF THE ACTION**

1. Officers with the San Jose Police Department intentionally destroyed evidence and caused Plaintiff Andrew Lee Johnson to be wrongfully incarcerated for over three years. The City of San Jose and SJPD have a constitutionally deficient data management system which results in missing evidence and the inability to track the user who deleted data from their database, thereby violating the rights of criminal defendants. The destruction of evidence was

1
Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

not disclosed to nor discovered by Johnson or his attorney until his jury trial. Johnson would eventually be acquitted at trial, but not before he was tortured in the Santa Clara County main jail for more than three years.

2.    Johnson, an Army veteran who had already suffered a traumatic brain injury and been diagnosed with PTSD before his arrest, was tortured by the Sheriff's Office when he was housed in solitary confinement and denied constitutionally adequate out of cell time. Johnson was abused by correctional staff and reported this abuse in writing to the jail, including reporting his fear that Deputy Lubrin was going to get someone killed. Lubrin would murder Michael Tyree only months after Johnson's written grievance regarding Lubrin's abuse.

3.    Correctional officers employed by the County of Santa Clara regularly use excessive force on detainees in their custody. The County has failed to properly train, supervise and discipline correctional officers for such conduct, and as a result there is a culture within the jail of excessive use of force. The County also fails to provide proper mental health and medical care to individuals in their custody, resulting in injuries and deaths. Plaintiff Andrew Johnson received deliberately indifferent treatment while in the care of the County of Santa Clara, and now seeks damages for this violation of his constitutional rights.

## JURISDICTION

4.    The claims alleged herein arise pursuant to 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution, the Americans with Disabilities Act (ADA), 42 U.S.C. §12101 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. §794.

5.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

**VENUE**

6.     Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b) because the unlawful acts, practices and omissions giving rise to the claims brought by Plaintiff occurred in the County of Santa Clara, which is within this judicial district.

**PARTIES**

7.     Plaintiff ANDREW LEE JOHNSON (hereinafter "JOHNSON") was at all times complained of herein, a pretrial detainee in the Santa Clara jails in the custody of Defendant Santa Clara County.  He was arrested by officers from the San Jose Police Department on November 12, 2014 and was incarcerated in the County jail until his release on February 7, 2018.

8.     Defendant COUNTY OF SANTA CLARA (hereinafter "COUNTY") is a municipal corporation duly organized under the laws of the State of California.  Under its supervision, the COUNTY operates the Santa Clara County Sheriff's Office ("SCCSO"), which in turn oversees the Department of Corrections ("DOC") which operates three jail facilities: The Main Jail Facility, Elmwood Women's Correctional Complex, and the Elmwood Men's Correctional Complex.  COUNTY is responsible for ensuring that jail policies and practices do not violate individuals' substantive and procedural due process rights.

9.     At all times mentioned herein, Defendant DEPUTY RUBAN (first name unknown; hereinafter "RUBAN") was employed as a correctional officer for defendant COUNTY. RUBAN is sued individually and as a correctional officer for the COUNTY.  By engaging in the conduct described below, Defendant RUBAN acted under the color of law and in the course and scope of his employment for Defendant COUNTY.  By engaging in the conduct

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

described here, Defendant RUBAN exceeded the authority vested in him as a correctional officer under the United States Constitution and as an employee of the COUNTY.

10.    At all times mentioned herein, Defendant MATTHEW REEVES was employed as a correctional deputy for defendant COUNTY.  Defendant MATTHEW REEVES is sued individually and as a correctional deputy for the COUNTY.  By engaging in the conduct described below, Defendant MATTHEW REEVES acted under the color of law and in the course and scope of his employment for Defendant COUNTY.  By engaging in the conduct described here, Defendant MATTHEW REEVES exceeded the authority vested in him as a correctional deputy under the United States Constitution and as an employee of the COUNTY.

11.    At all times mentioned herein, Defendant DEPUTY DOMINGUEZ (first name unknown; hereinafter "DOMINGUEZ") was employed as a correctional deputy for defendant COUNTY.  Defendant DOMINGUEZ is sued individually and as a correctional deputy for the COUNTY.  By engaging in the conduct described below, Defendant DOMINGUEZ acted under the color of law and in the course and scope of his employment for Defendant COUNTY.  By engaging in the conduct described here, Defendant DOMINGUEZ exceeded the authority vested in him as a correctional deputy under the United States Constitution and as an employee of the COUNTY.

12.    At all times mentioned herein, Defendant JEREH LUBRIN (hereinafter "LUBRIN") was employed as a correctional deputy for defendant COUNTY.  Defendant LUBRIN is sued individually and as a correctional deputy for the COUNTY.  By engaging in the conduct described below, Defendant LUBRIN acted under the color of law and in the course and scope of his employment for Defendant COUNTY.  By engaging in the conduct described

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

here, Defendant LUBRIN exceeded the authority vested in him as a correctional deputy under the United States Constitution and as an employee of the COUNTY.

13.     At all times mentioned herein, Defendant JONATHAN BENSON (hereinafter "BENSON") was employed as a correctional deputy for defendant COUNTY.  Defendant BENSON is sued individually and as a correctional deputy for the COUNTY.  By engaging in the conduct described below, Defendant BENSON acted under the color of law and in the course and scope of his employment for Defendant COUNTY.  By engaging in the conduct described here, Defendant BENSON exceeded the authority vested in him as a correctional deputy under the United States Constitution and as an employee of the COUNTY.

14.     At all times mentioned herein, Defendant DOES 1-25 were employed as correctional deputies by defendant COUNTY.  Defendant DOES 1-25 are sued individually and as a correctional deputy for the COUNTY.  By engaging in the conduct described below, Defendant DOES 1-25 acted under the color of law and in the course and scope of their employment for Defendant COUNTY.  By engaging in the conduct described here, Defendant DOES 1-25 exceeded the authority vested in them as correctional deputies under the California State and United States Constitutions as employees of the COUNTY.

15.     Defendant CITY OF SAN JOSE (hereinafter referred to as "CITY") is and at all times mentioned herein was a municipal corporation, duly authorized to operate under the laws of the State of California.  Under its supervision, the CITY operates the San Jose Police Department ("SJPD").

16.     At all times mentioned herein, Defendant MARCO MONZON (hereinafter "MONZON") was employed as a police officer for defendant CITY.  Defendant MONZON is sued individually and as a police officer for the CITY.  By engaging in the conduct described

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

below, Defendant MONZON acted under the color of law and in the course and scope of his

employment for Defendant CITY. By engaging in the conduct described here, Defendant

MONZON exceeded the authority vested in him as a police officer under the United States

Constitution and as an employee of the CITY.

17.    At all times mentioned herein, Defendant TRENT TESSLER (hereinafter "TESSLER")

was employed as a police officer for defendant CITY. Defendant TESSLER is sued

individually and as a police officer for the CITY. By engaging in the conduct described

below, Defendant TESSLER acted under the color of law and in the course and scope of his

employment for Defendant CITY. By engaging in the conduct described here, Defendant

TESSLER exceeded the authority vested in him as a police officer under the United States

Constitution and as an employee of the CITY.

18.    At all times mentioned herein, Defendant JAMIE LEE NICHOLAS HALL (hereinafter

"HALL") was employed as a police officer for defendant CITY. Defendant HALL is sued

individually and as a police officer for the CITY. By engaging in the conduct described

below, Defendant HALL acted under the color of law and in the course and scope of his

employment for Defendant CITY. By engaging in the conduct described here, Defendant

HALL exceeded the authority vested in him as a police officer under the United States

Constitution and as an employee of the CITY.

19.    At all times mentioned herein, Defendant DOEs 1-25 were employed by defendant

CITY. Defendants DOES 1-25 are sued individually and as employees for the CITY. By

engaging in the conduct described below, Defendant DOES 1-25 acted under the color of law

and in the course and scope of their employment for Defendant CITY in violation of the State

of California and United States Constitution.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

## FACTUAL ALLEGATIONS

**Background Facts: JOHNSON is a Disabled Army Veteran, Attending College Full-time and Employed Full-time.**

20.     ANDREW JOHNSON was born in 1988 and raised on the East Coast.  In 2008, he enlisted in the United States Army, during a time when the U.S. was fully committed to two protracted ground wars (Iraq and Afghanistan), neither of which had an end in sight.  In 2009 he was stationed in Germany, where he befriended a fellow soldier named Ignacio Arriaga. The two became best friends, however in November of 2010, Arriaga suffered a serious injury when he was deployed in Afghanistan, which rendered him paralyzed.

21.     Arriaga was eventually transferred to Walter Reed Army Medical Center in the Washington D.C. area.  JOHNSON, who was at that time undergoing Special Forces Training in Fort Bragg, North Carolina, used his leave to visit Arriaga in the hospital.  JOHNSON promised Arriaga that when he was discharged from the Army, JOHNSON would take care of Arriaga.  Then in October of 2012, JOHNSON suffered a traumatic brain injury ("TBI") and was in a coma for two weeks.  The TBI exacerbated his PTSD symptoms.  After his release from the hospital, JOHNSON had approximately eight months remaining in the Army.

22.     When JOHNSON was honorably discharged in 2013, he moved to San Jose, California, where Arriaga was from, to keep his promise to his friend.  JOHNSON had no other connection to California.  He obtained his CPR certification and earned a caregiver's certificate from the Department of Veterans Affairs ("VA").  He and Arriaga were roommates and JOHNSON cared for his quadriplegic friend 24/7 until his arrest on November 12, 2014.

23.     During this time in San Jose, JOHNSON was also a full-time student, taking a 20-unit course load which included on campus and online courses.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

24.    In the summer of 2014, JOHNSON's three-and-a-half-year-old daughter stayed with him for the summer.  After she returned to her mother in Michigan at the end of summer, JOHNSON would Skype with her regularly and they had a very close relationship.

**JOHNSON Defends Himself Against Two Drunk Men Who Try to Rob Him Near His Apartment, Gets Arrested.  SJPD Officers Destroy Exculpatory Evidence in Bad Faith.**

25.    On October 27, 2014, around 5:00 or 6:00pm JOHNSON was walking home to his apartment in San Jose when he encountered two drunk men on the street.  As JOHNSON crossed paths with the men, one or both of them said something to him but he could not tell what they were saying because they were so drunk, and he just disregarded them and returned home.

26.    Later that night around 11:40pm, JOHNSON walked from his apartment to the market across the street to buy some things before it closed at midnight.  He was surprised to find that the market had closed early.

27.    He started to return to his apartment, but as he waited at the crosswalk to cross Capitol Expressway, he heard people coming toward him in the dark behind him.  He turned around but could not see who they were until they stepped under the street lamp and JOHNSON recognized them as the same two drunk men from earlier.  The men came within arms distance of JOHNSON, who now had his back to the busy traffic.

28.    One of the men said "trese" and "this is the southside, give it up," and brandished a knife.  JOHNSON declined to give up his belongings and put both of his hands up, palms facing the men and said, "I just want to go home."  Suddenly, the other man grabbed JOHNSON who, fearing he would be pushed into traffic, pushed the man off of him and took out his firearm that he always carried with him.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

29.    JOHNSON had obtained the marksmanship level of expert in the ARMY and could have shot to kill if he had intended to.

30.    Not wanting to fire the weapon, he warned the men to stay back, but they were too drunk or too determined to comply.  JOHNSON fired a warning shot into the sidewalk, but the men were not deterred.  He fired another warning shot into the ground, but the men continued to advance and JOHNSON, with his back to traffic, felt that he had no choice but to shoot one of the men in the leg, and the other in the hip.

31.    JOHNSON, in shock, crossed the street and entered his apartment complex while a passerby who happened to be an EMT rendered aid to the men.

32.    SJPD officers were on scene within minutes and the injured men, who turned out to be brothers, were taken to the hospital.

33.    SJPD officer Jamie Hall interviewed one brother, Bicente Castro, at Valley Medical Center ("VMC").  Hall took handwritten notes and obtained a statement from Bicente regarding the circumstances of the shooting.

34.    Hall also recorded this interview with Bicente on his department issued recording device and later uploaded the audio file to both his work computer terminal, as well as DCS, the SJPD data management system.  Hall received an email receipt confirming this upload to DCS.

35.    Hall used his handwritten notes to draft a summary of this interview with Bicente and included it in the narrative of his incident report.  Hall destroyed his handwritten notes from the interview, so they were never provided to the defense.

36.    Bicente's version of events did not comport with the evidence at the scene, he had trouble remembering how he and his brother had spent the hours leading up to the shooting,

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

and the timeline he provided to Hall of his actions that evening had hours of unaccounted time.  Bicente was still intoxicated at the time of this interview: medical records showed his blood alcohol at twice the legal driving limit.

37.    The recording of this initial interview with Bicente would eventually be deleted from Hall's recording device by DOE 1.  DOE 1 knew the exculpatory nature of the evidence before it was intentionally destroyed.

38.    The recording of this initial interview with Bicente would eventually be deleted from Hall's work computer terminal by DOE 2.  DOE 2 knew the exculpatory nature of the evidence before it was intentionally destroyed.

39.    The recording of this initial interview with Bicente would eventually be deleted from the DCS data management system by DOE 3.  DOE 3 knew the exculpatory nature of the evidence before it was intentionally destroyed.

40.    The recording of this initial interview with Bicente was never turned over to the defense.

41.    SJPD officer MONZON interviewed the other brother, Alvaro Castro, at Regional Medical Center ("RMC").  MONZON took handwritten notes and obtained a statement from Alvaro regarding the circumstances of the shooting.

42.    MONZON also recorded this interview with Alvaro on his department issued recording device and later uploaded the audio file to both his work computer terminal, as well as DCS, the SJPD data management system.  MONZON received an email receipt confirming this upload to DCS.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

43.     MONZON used his handwritten notes to draft a summary of this interview with Alvaro and included it in the narrative of his incident report.  MONZON destroyed his handwritten notes from the interview so they were never provided to the defense.

44.     Alvaro's version of events did not comport with the evidence at the scene, he had trouble remembering how he and his brother had spent the hours leading up to the shooting, and the timeline he provided to MONZON of his actions that evening had hours of unaccounted time.  Alvaro was still intoxicated at the time of this interview: his medical records showed that he had acute alcohol poisoning, an obviously important aspect of the witness/victim's credibility, yet MONZON did not include any mention of his level of intoxication in his official police report.

45.     The recording of this initial interview with Alvaro would eventually be deleted from MONZON's recording device by MONZON, and/or DOES 26-50, each of whom knew the exculpatory nature of the evidence before it was intentionally destroyed.

46.     The recording of this initial interview with Alvaro would eventually be deleted from MONZON's work computer terminal by MONZON, and/or DOES 26-50, each of whom knew the exculpatory nature of the evidence before it was intentionally destroyed.

47.     The recording of this initial interview with Alvaro would eventually be deleted from the DCS data management system by MONZON, HALL, TESSLER, or DOES 26-50, each of whom knew the exculpatory nature of the evidence before it was intentionally destroyed.

48.     The recording was never turned over to the defense attorneys for JOHNSON prior to, or during trial on the charges of attempted murder.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

49.    MONZON, HALL, TESSLER, and/or other unknown DOE defendant (26-50) SJPD officers went to nearby businesses to seek witnesses or camera footage that could help fill in the blanks of what had happened that night.

50.    Carlos Torres Garcia, a cashier at the nearby Taqueria el Coral, told officers that the brothers had been drunk and loud in his restaurant the evening of the shooting and that Garcia had told the kitchen to hurry up with the brothers' food so they would leave.

51.    Officer MONZON interviewed Naresh Sharma, manager at the nearby Bonfare Market, who reported that the brothers had been disruptive in the market around 11:30p.m. that evening, staggering drunk, and that Alvaro had accused Sharma of calling the police on him.

52.    Sharma showed MONZON surveillance video of Alvaro forcing his way behind the counter, after which the brothers were told to leave and Sharma closed the doors and locked them so that the brothers would not come back and cause more trouble.  Sharma also showed MONZON a video of JOHNSON who had made a purchase earlier in the day.

53.    MONZON failed to preserve the video of Alvaro threatening the manager of the market 15 minutes prior to the shooting, although he did preserve the video depicting JOHNSON from earlier in the evening.

54.    Although the video footage showed Alvaro jumping over the counter, MONZON did not so much as request a copy of the portion of the video showing Alvaro jumping over the counter.  However, he did obtain from the manager the footage of JOHNSON.

55.    Detective TESSLER was concerned that the brothers' statements did not match, and there was missing information, and that the statements were very inconsistent with the physical and other evidence.  TESSLER had Officer Lauren Vidal interview Bicente again to clean up some of the inconsistencies and gaps in time from his first statement given to HALL.

12

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

56.    Officer Vidal conducted an audio-recorded interview with Bicente on October 28, 2014, but Bicente still could not account for about a three-hour period leading up to the shooting.

57.    TESSLER personally interviewed Alvaro on October 28, 2014, to try to clear up his first interview with HALL, which also had pieces of missing time and information.

58.    The next day, October 29, 2014, TESSLER went with Ofr. Vidal to interview Bicente for a third time.  The officers tried to "help" Bicente fill in the blanks based on receipts, video and witness statements they had obtained.  All of their "help" was directed towards placing culpability on JOHNSON for the crime he did not commit.

59.    On October 30, 2014, TESSLER again interviewed Alvaro and presented him with receipts and witness statements to help Alvaro come up with a more plausible version of events, so implausible had been Alvaro's statements to that point.  Alvaro was surprised that receipts showed a different timeline of events than he recalled, taking into account he did not recall much because he was so severely intoxicated.

60.    TESSLER interviewed the property manager for JOHNSON's apartment building and learned that residents must access the property with a key fob.  The property manager gave TESSLER a thumb drive containing the data connected to JOHNSON's key fob.

61.    TESSLER never provided this evidence – the existence of a key fob - to the defense, rather he provided a print out of his own version of JOHNSON's comings and goings and represented that it was from the property manager.

62.    The fact is TESSLER altered the information from the key fob.

63.    The first time JOHNSON's attorneys or JOHNSON learned anything about the existence of a key fob, was when the apartment manager mentioned it during trial.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

64.    At trial, JOHNSON recognized that the printed data did not accurately reflect his activity that day and told his lawyer, who then got TESSLER to admit that he actually was given the data from the key fob use, on a thumb drive.  This data was manipulated by TESSLER, MONZON, HALL and/or DOEs 26-50 prior to being printed and provided to the defense and used as evidence against JOHNSON at trial.

65.    TESSLER interviewed a clerk from the Bonfare Market who told TESSLER that around 11:00p.m. the Castro brothers had come into the market and Alvaro caused a disturbance in the store.

66.    The clerk told TESSLER that the Castro brothers had argued with customers and accused the clerk and his coworker of calling the cops on him.

67.    TESSLER was also told that Alvaro bought some beer and left but returned approximately 30 minutes later and forced his way behind the counter claiming he was looking for his backpack.

68.    The clerk told TESSLER that he believed Alvaro was looking for trouble so after Alvaro left, he locked the front door because he was scared that he may return and cause more trouble.

69.    The clerk told TESSLER that approximately 10 minutes later he heard fighting and the shooting happen outside.

70.    JOHNSON was later arrested by SJPD and interrogated by TESSLER; JOHNSON was chained to a chair and/or a desk during the interrogation.

71.    During the course of the interrogation, TESSLER continued to question JOHNSON even though JOHNSON asked for an attorney three separate times.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

72.     While chained to the desk, JOHNSON stated that he was tired, hungry and needed his medication, but TESSLER proceeded with the unlawful interrogation in violation of JOHNSON's rights.

**JOHNSON, Suffering from PTSD and TBI, is Housed in Solitary Confinement at Main Jail for 16 Months, Denied His Prescription Medication and Gained 80 Pounds.**

73.     On November 12, 2014, JOHNSON was booked into the COUNTY jail on two counts of attempted premeditated murder and one count of misdemeanor cocaine possession.

74.     JOHNSON reported at intake that he was diagnosed with PTSD by the VA and has a prescription for Zoloft.

75.     JOHNSON was denied his Zoloft, or any other medication to treat his chronic mental health issues, for more than one month.

76.     JOHNSON was finally prescribed Zoloft and Vistaril on December 15, 2014.

77.     When JOHNSON arrived at the jail, an unknown classification deputy/deputies (DOE 1-25) ordered that he be housed in administrative segregation, also called solitary confinement, in housing unit 4B.

78.     This housing decision was based solely on JOHNSON's charges. The housing decision was made with full knowledge of DOES 1-25 that JOHNSON had substantial psychiatric issues from his service to his Country.

79.     JOHNSON was presumed innocent under the law and this was his first time being incarcerated.

80.     JOHNSON received no infractions for disciplinary issues or jail rules violations during his entire time in custody.

81.     DOE 1-25's decision to put JOHNSON in solitary confinement was malicious, sadistic and unrelated to any penological interest.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

82.    In combination with the denial of JOHNSON's medication, this unnecessary isolation housing situation caused JOHNSON's mental health to decline quickly.

83.    JOHNSON was effectively denied access to the minimum three hours per week of exercise to which he is entitled under California Code of Regulations, Title 15 § 1065.

84.    JOHNSON was isolated in a tiny cell for 23 to 24 hours of every day, without receiving out-of-cell time that he is entitled to under state law repeatedly.

85.    The United Nations ("UN") Human Rights Council on Torture and other Cruel, Inhuman or Degrading Treatment or Punishment defines solitary confinement as "physical and social isolation of individuals who are confined to their cells for 22 to 24 hours a day."

86.    The UN Committee against Torture recommends that solitary confinement of persons with psychosocial disabilities be prohibited.

87.    The UN defines "prolonged solitary confinement" as any period of solitary confinement in excess of 15 days, and that the already harmful regime of solitary confinement becomes prolonged and therefore "unacceptably painful" after that time.

88.    The UN has concluded that 15 *days* is the limit because at that point research shows that some of the harmful psychological effects of isolation can become irreversible, untreatable, and irremediable for life.

89.    JOHNSON was in solitary confinement for his first 16 *months* in custody, where he was regularly forced to sit idle locked in his small cell for 47 hours at a time.  When JOHNSON did get his one hour out every other day, he had to use this limited time to shower, call his family and get what physical activity he could in the time remaining.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

90.   This isolation is inhumane, especially for people like JOHNSON who suffer from preexisting mental health conditions and are likely to experience serious psychological and physiological harm as a result of this COUNTY's policies and/or practices.

91.   JOHNSON and numerous other prisoners have provided the COUNTY with notice by filing administrative grievances regarding this unconstitutional lack of out-of-cell time long before the incarceration of JOHNSON and the COUNTY was and remains deliberately indifferent to the serious risk of harm and actual harm caused by these conditions.

92.   In addition to the solitary conditions, JOHNSON was also forced to have a 24/7 nightlight which illuminated his cell and disrupted his sleep.  JOHNSON complained to staff about this bright light and despite there being no legitimate penological interest in keeping it on, the jail and/or DOES 1-25 failed to accommodate his request to turn it off at night.

93.   The unhygienic conditions within the jail caused JOHNSON to get ill, including developing a toe nail fungus due to not receiving clean socks frequently enough.  The jail issued prisoners one pair of socks and one pair of underwear which could be exchanged for clean sets twice per week.  In response to his medical diagnosis of a fungal infection, JOHNSON's medical records indicate that he was issued a "medical authorization for issue of clean socks for 14 days."

94.   The jail-issued blankets were rarely washed, and the sheets were ripped and frequently had blood stains.  The temperature of the cells was often uncomfortably hot or cold, causing JOHNSON and other prisoners to have to block their vents to prevent from freezing.

95.   JOHNSON and other prisoners would frequently have unexplained rashes which would not go away without prescription treatment.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

96.   JOHNSON did not get to see a dentist during his years in custody.  When he complained of a cavity, the jail just issued him pain medication.

97.   JOHNSON also at various times had weeks long delays in receiving his medications.

98.   On December 16, 2015, JOHNSON's prescription Vistaril was abruptly discontinued – JOHNSON had been taking this medication for his anxiety and to help him sleep since April 14, 2015.  Due to the discontinuation and lack of medical supervision, JOHNSON could not sleep for days and submitted a written request to medical to rectify the situation.  On December 26, 2015 JOHNSON's father called jail medical to advise that his son was not doing well, has depression and PTSD, and was not receiving his prescription.  Finally, on December 28, 2015, the jail finally restarted JOHNSON's Vistaril.

99.   Due to the lack of opportunity for exercise, JOHNSON gained 80 pounds in his first two years in custody.  When he was booked into the jail in November 2014, medical records show he weighed 180 pounds.  By November 2015 he weighed 240 pounds.  By December 2016 he weighed 262 pounds.

100.  Due to this massive weight gain in such a short period of time, JOHNSON developed painful feet due to the cheap unsupportive jail-issued sandals.  He requested a medical authorization for proper footwear, and although the doctor approved it, his request was denied by corrections staff.

101.  JOHNSON, who had never been over 200 pounds in his life prior to coming into custody, tried a low-sodium low-fat diet but was still unable to keep the weight off due to his lack of activity being confined to his cell for 47 out of 48 hours.

102.  This denial of environmental stimulation and basic necessities of life is unacceptable in a civilized society for any prisoner, but it is notable that during his entire incarceration,

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

JOHNSON was a pretrial detainee who was not serving a sentence and was presumed innocent.

**JOHNSON is Abused by Correctional Staff and Witnesses Abuse of Fellow Prisoners While in Main Jail.**

103.   Correctional Deputy JEREH LUBRIN was assigned to JOHNSON's housing unit on the 7th floor for about six months.

104.   LUBRIN would sadistically and maliciously abuse JOHNSON and the other prisoners.

105.   LUBRIN was familiar with the racial politics among the prisoners and would exploit this tension in an attempt to cause race riots.  On multiple occasions LUBRIN was successful, including when he would pop the cell doors of rival groups just so that they would fight and lose privileges.

106.   LUBRIN would also intentionally move prisoners who did not get along into the same cell just to provoke a disturbance.

107.   LUBRIN's cruel and unprofessional behavior was cosigned by, if not encouraged by, his training officer BENSON.

108.   LUBRIN and BENSON came into JOHNSON's cell and LUBRIN asked, "JOHNSON, do you know why I'm hitting your cell?"  When JOHNSON did not reply LUBRIN said, "Because BENSON said I'm a pussy and wouldn't do it.  Do you think I'm a pussy JOHNSON?"

109.   JOHNSON looked at BENSON and asked, "Why are you training him like this, man?"

110.   LUBRIN's verbal harassment was intended to humiliate and endanger the prisoners. His harassment often focused on black prisoners, including threats to do "butthole checks" on all of the black prisoners.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

111.  JOHNSON is informed and believes that on one occasion, LUBRIN received 28 grievances in one day from the 7th floor housing unit.

112.  LUBRIN was not deterred, but instead enjoyed the attention, stating, "If I get 30 grievances I'll text my buddy that I did a good job today."

113.  Around March 2015, LUBRIN intentionally caused a disturbance in JOHNSON's housing unit, resulting in the entire pod being locked down for four days.  No prisoners in that pod were allowed out of their cells for the entire four days.

114.  On the fourth day, when LUBRIN was not on duty, Deputy MATTHEW REEVES was in charge of letting prisoners out for their out-of-cell time as required by law.

115.  REEVES was programming the two-tiered housing unit a quarter at a time.

116.  After three groups had come out, JOHNSON's group was up last.  JOHNSON was eager to come out since he had been denied a shower for four days, but more importantly he had not spoken to his young daughter and wanted to call her.

117.  Instead of letting the last group out for program, REEVES told them they would not get to program that day.  JOHNSON pleaded with REEVES and said he wanted to call his daughter.

118.  REEVES responded, "You guys aren't coming out, but I'll be programming on my couch when I get home."

119.  JOHNSON was angered and frustrated and called REEVES a "bitch."

120.  REEVES asked JOHNSON, "What did you say(?)," And JOHNSON repeated himself.

121.  REEVES left the housing unit and came back approximately thirty minutes later with Deputy DOMINGUEZ and Deputy RUBAN.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

122.   The three deputies approached JOHNSON's cell and RUBAN asked JOHNSON through the closed cell door, "Did you call my partner an asshole?"  JOHNSON responded, "No, I called him a bitch."

123.   RUBAN told JOHNSON, "Alright, get against the wall."  JOHNSON complied, and all three deputies entered JOHNSON's cell.  JOHNSON's cellmate, who was on his bunk, was ordered to face the wall, which he did.

124.   JOHNSON was handcuffed as he stood facing the wall, and once he was if cuffs he immediately started feeling kicks and punches to his back.

125.   DOMINGUEZ told JOHNSON, "I'll break your face," and dragged JOHNSON over to his desk and forced him to bend over the desk.

126.   DOMINGUEZ restrained JOHNSON while RUBAN got behind JOHNSON, who remained bent over the desk, and RUBAN grinded up against JOHNSON's body, rubbing his crotch on JOHNSON's buttocks while saying, "Do you like that faggot? Who's the bitch now?"

127.   JOHNSON instinctively wanted to get the deputies off of him but knew that resisting or fighting them off would only make things worse for his criminal case and likely increase the beating he was receiving.  Despite standing 6'4" and trained in self-defense, JOHNSON was outnumbered and powerless in the face of their abuse of authority.

128.   The deputies then forced JOHNSON out of his cell, out of the housing unit to an interview room.

129.   No sooner was JOHNSON in the interview room and completely out of view of any of the other inmates in the jail, did the deputies slam him against the wall and begin punching his lower back while berating and cursing at him.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

130.   The deputies seemed to be using all their might because they were grunting, and the strikes were punishing blows.

131.   REEVES used his combat boots to repeatedly stomp on JOHNSON's feet, which were in jail-issued sandals.

132.   The attack in the interview room lasted for about 15 seconds before the guards tired themselves out.

133.   JOHNSON was left in the interview room for what seemed like an hour before REEVES came in and asked, "you ready to go back?"  JOHNSON did not respond.

134.   Sgt. John Montalvo then appeared at the door and asked, "you ready to go back?  I'm not going to write you up for anything, just going to take you back to your cell."

135.   JOHNSON responded, "write me up for what?  *They* beat me!"  Montalvo then escorted JOHNSON back to his cell without incident.

136.   JOHNSON did not immediately write a grievance or otherwise complain about the incidents in his cell and the interview room because he feared retaliation from the involved deputies or their colleagues, including LUBRIN.

137.   However, another inmate who had witnessed the beating in the cell reported it, resulting in Internal Affairs later coming to interview JOHNSON.

138.   LUBRIN exchanged sadistic text messages with fellow deputies regarding using excessive force, sharing their contempt for prisoners and taking pleasure in seeing them suffer.

139.   On July 26, 2015, LUBRIN exchanged texts with Deputy Matthew Farris regarding using excessive force and admitting to "smashing fools," including a prisoner who "was a marine in the 80s."

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

140.  JOHNSON had been in 7B with LUBRIN and his brutal colleagues and had written multiple grievances about LUBRIN.

141.  JOHNSON at one point, before the brutal murder of Michael Tyree, and inmate whose murder led to the conviction of LUBRIN and two others, JOHNSON expressly wrote in his grievance a warning that if the jail did not do something about Deputy LUBRIN and his sadistic ways, LUBRIN was going to kill someone someday.

142.  Sure enough, on August 26, 2015, LUBRIN, Farris and Dep. Rodriguez murdered Michael Tyree while JOHNSON sat locked in a cell on the floor above and could hear his cries through the thick concrete floors.

143.  Prior to the death of Michael Tyree, Captain Blanca Hoyt, the Facility Commander of the main jail, was aware that Deputy LUBRIN has multiple recent allegations of excessive use of force and other abuse of prisoners.

144.  When Internal Affairs ("IA") came to see JOHNSON around a year after the beating by RUBAN, REEVES, and DOMINGUEZ, he was surprised that they knew about it.  They told him that a witness had reported it, but they would not tell him who it was.

145.  JOHNSON told the IA investigators the whole story and believes they audio-recorded his two-hour statement.  He would later give the same statement to two more investigators, who also recorded the interview.  JOHNSON told investigators that he still sees the involved deputies because they continue to work his housing unit, making him feel unsafe.

146.  County failed to protect JOHNSON from RUBAN, even after County was on notice that RUBAN had abused JOHNSON, and that JOHNSON had alleged that RUBAN had used excessive force and was harassing him.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

147.  Sgt. Montalvo said that the deputies would be kept away from JOHNSON for his safety, but they continued to work his housing unit.

148.  Around March 2016 JOHNSON spoke to Lt. Rita Roland and informed her of the beating and that the involved deputies still worked in his housing unit and he feared they would retaliate or further harass him.  He told her that he recently encountered DOMINGUEZ and was having increased anxiety.  He pleaded with her to keep the involved deputies away from him and asked to be down-classed to a program dorm.  She told him that she would move him to 7B and put a "keep away" in place so that DOMINGUEZ, REEVES and RUBAN would not work JOHNSON's housing unit.

149.  In March 2016 JOHNSON submitted a grievance asking to be down-classed and pointed out that his attempted murder charges had been dismissed and he was now facing less serious charges.  Classification officer Hernandez responded that since his attempted homicide charge has been reduced, he would be down-classed.  JOHNSON was moved to 7B shortly thereafter.

150.  JOHNSON continued to see the deputies in his housing unit and would alert other staff that they were not supposed to be near him.  On November 19, 2016, DOMINGUEZ worked JOHNSON's housing unit.

151.  On December 4, 2016, DOMINGUEZ was in JOHNSON's housing unit again and entered his cell for bar checks.  JOHNSON submitted a written grievance complaining of the two recent encounters with DOMINGUEZ but received a response saying that "we do not keep keep aways from inmates and officers unless there are major concerns."

152.  On December 18, 2016, JOHNSON's attorney, Cameron Bowman, came to visit him. As the deputy assigned to JOHNSON's housing unit pulled him out and brought him out of

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

the pod to hand him off to the deputy to take him to the interview room, JOHNSON saw that it was DOMINGUEZ walking toward him.  JOHNSON told DOMINGUEZ, "no you're not chaining me after you beat my ass."  Bowman walked toward the commotion and told JOHNSON to calm down.  JOHNSON, who had previously told Bowman about the ongoing abuse by the deputies, said: "It's him!  He's the one who beat me!  He's not allowed to be around me!"

153.  Since JOHNSON refused to be escorted by DOMINGUEZ, Sgt. Montalvo had to be called.  Sgt. Montalvo spoke to JOHNSON and Bowman, and wrote in a response to a prior grievance from JOHNSON "I spoke to you and your attorney on 12/18/16 and tried to resolve this issue.  We will continue to handle it on our side."

154.  In June 2017, filed another grievance asking why he had been in 7B for 15 months and asked to be down-classed to less restrictive housing.  Later that month JOHNSON was finally down-classed and transferred to Elmwood where he was able to have a little more out-of-cell time.  This meant more phone calls with his young daughter who was on Eastern Time Zone in Michigan.

155.  After only a few weeks at Elmwood, on July 12, 2017, JOHNSON, witnessed Deputy Rico West striking prisoner Aaron Steward on the head repeatedly as he lay prone on the concrete tier.

156.  The entire pod was in an uproar, trying to get West to stop his attack.  The men banged and kicked their doors and screamed for help.

157.  Deputy BENSON had to grab West by his shirt to pull him off of Steward.

158.  West and BENSON picked Steward up and attempted to walk him out of the pod, but Steward could barely walk and seemed in and out of consciousness.  The deputies had to

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

support Steward by lifting him under each arm and guiding him down the stairs and out of the pod.

159.   Steward's blood covered the tier walkway and would later be photographed by investigators.

160.   The men in M5-D continued in an uproar about what they had just witnessed.  They banged and kicked their doors and chanted "Fuck the police!" and "Get him to a hospital!"

161.   Sergeant Alvarez and a Jail Crimes detective responded to M5-D shortly after Steward was removed from the pod.

162.   JOHNSON, in cell 2, saw the detective holding up a video camera with one hand while he used his other hand to motion for the prisoners to "turn it up."

163.   JOHNSON would later be pulled from his cell for an interview about what he witnessed.

164.   After JOHNSON detailed the brutal attack on Steward and insisted that West was the aggressor, JOHNSON said that he was going to call Internal Affairs and go on a hunger strike.

165.   The interviewers asked JOHNSON why he kicked his door and threatened him with charges for inciting a riot.

166.   Within hours of his interview, JOHNSON was transferred out of Elmwood to a more restrictive housing unit at the Main Jail.

167.   Due to this retaliatory move of blatant witness intimidation, JOHNSON was unable to continue doing the programs he was participating in at Elmwood, was not allowed out of his cell nearly as much and had fewer phone calls with his six-year-old daughter.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

168.  Back at the main jail in 5C, JOHNSON encountered REEVES on December 6, 2017, despite being told that there was a keep away.

169.  During a couple days of JOHNSON's trial, he was escorted alone by RUBAN, including being in a small elevator with him.

170.  JOHNSON is not the only prisoner beside Tyree and Steward who were abused, even to the point of hospitalization and death.

171.  County has been on notice of hundreds of excessive force allegations during the time JOHNSON was in custody, including the death of Walter Roches, the retaliatory cell extraction beatings of Jessie Grant and Adrian Villalon, the interview room beating of Daniel Reyes by murderer CO Matthew Farris weeks prior to him murdering Tyree, the interview room beating of Julian Vasquez-Bernabe, and too many more.

**JOHNSON is Stuck in Jail Due to the Unethical Conduct of the Deputy District Attorney and San Jose Police Officers**

172.  At JOHNSON's arraignment, Deputy District Attorney Judy Lee argued for an unconstitutionally high bail of $2 million, which the court imposed at her request.

173.  JOHNSON and his family had to decide between posting bail so that he could fight his case from home or retaining a lawyer who could competently represent him and devote the necessary time to his case.

174.  JOHNSON made the decision to retain highly respected attorney Cameron Bowman, which meant that he and his family would not be able to afford to bail him out pending trial. Little did JOHNSON know that he would not be heard by a jury for more than three years.

175.  Attorney Bowman requested discovery from DDA Judy Lee pursuant to Cal. Penal Code § 1054 and 1054.5(b) immediately after being retained by JOHNSON.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

176.  Lee failed to preserve the audio-recorded interviews of the complaining witnesses or tell Bowman that they had been deleted from multiple locations until trial had already begun.

177.  At JOHNSON's preliminary hearing in February 2016, SJPD Officer Scott Williams testified about evidence he gathered at the scene of the shooting.  He was presented by Lee with a sealed evidence envelope and asked to authenticate the contents.  He authenticated three spent lead projectiles, but there was an extra piece of "evidence" in the sealed bag that he did not recognize.  He read the crime lab label which said "lab" and "found on the floor" and "unknown source."

178.  DDA Lee asked Ofr. Williams, "So that's not something you collected?"  Ofr. Williams responded, "No.  It was not."  DDA Lee still asked the officer to put the unknown "evidence" back in the envelope and then asked the judge to admit it into evidence in JOHNSON's case.

179.  After hearing all the evidence at the preliminary hearing, the court found that there was not enough to hold JOHNSON to answer on the attempted homicide charges because JOHNSON had no intent to kill the brothers.  The court found that, "through two days of testimony, 60 exhibits, 11 witnesses… I haven't seen [intent]… I really just see no evidence of express malice much less premeditation… I cannot find even for the low standard of a preliminary examination that there is an intent to kill."

180.  The court reduced the charges to two counts of assault with a deadly weapon with great bodily injury and said bail would be reduced from $2 million to $500,000.  DDA Judy Lee opposed this reduction in bail and argued for it to remain at $2 million, so the court set bail at $1 million.  JOHNSON nor his family could afford this unconstitutionally high bail since by this point they had already paid $100,000 in attorney and investigator fees.  They still had to pay expert witness fees, so JOHNSON continued to languish in jail.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

181.   Despite the court's clear findings of fact and law, DDA Judy Lee re-filed the attempted homicide charges and forced JOHNSON to stay in jail for almost two more years, fighting his case.  A second judge threw out the attempted homicide charges again, but DDA Judy Lee and her office filed an appeal and the charges were reinstated.

**JOHNSON Finally Goes to Jury Trial and is Acquitted**

182.   JOHNSON's parents, William and Angela Johnson, flew from Virginia to be present for JOHNSON's entire trial.  William Johnson was in court every day, however Angela Johnson was on the defense witness list for trial so she was not allowed in the courtroom until after she testified, which was not until weeks into trial.  Ms. Johnson did not want the jurors to think she did not support her son, so she sat in the hallway outside of the courtroom so that they would see her there on breaks.

183.   This vantage point allowed Ms. Johnson to observe prosecution witnesses in the hallway before and after their testimony.  When police officers would come out they would discuss their testimony with the officer waiting to be called. This is unethical at the very least, and the very reason that witnesses are kept out of the courtroom until they testify.

184.   Based on the missing audio-recorded statements of the complaining witnesses, the court allowed a hearing pursuant to Cal. Evid. Code § 402 to determine outside the presence of the jury how the recordings got deleted.

185.   A City of San Jose employee named Michael Teachess who was assigned to the IT Department that handles SJPD evidence databased testified at the 402 hearing.  He testified that in a four-month period, there were 12 instances of missing data.  He testified that there are 150 pieces of data uploaded per day, with 4,200 files total in that time period.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

186.  The City of San Jose Police Department has a data management problem if the odds are 1 in 350 that SJPD will lose a file.  Of course, the odds are much lower that two of the deleted files are from the same case, evidencing bad faith on the part of the police department.

187.  Teachess came out into the hallway after testifying and told MONZON, who was up next and looked nervous, "it's not that bad."  Teachess was prepping him, saying it's not going to be that bad, and MONZON said "I can't believe we both deleted it."

188.  After hearing the testimony at the 402 hearing, the court ruled that the defense could question officers MONZON and HALL in front of the jury about how the files ended up deleted.

189.  During the jury trial, JOHNSON testified on his own behalf and mentioned that he has been fighting his case from jail for more than three years.  Following his testimony, the jury sent a note to the judge asking why JOHNSON was still in custody and why he was not able to be bailed out.

190.  Witness Brian Karp, a criminalist from the County Crime Lab, testified for the prosecution regarding the bullet fragments found at the scene.  On cross examination by Cameron Bowman, Karp admitted that he had left out of his report the fact that the bullet fragments had trace evidence of concrete on them, consistent with JOHNSON's testimony that he fired multiple warning shots into the sidewalk.

191.  Alvaro Castro admitted under cross examination by Bowman that he might have had a knife on him at the time of the shooting.

192.  Alvaro Castro has prior convictions, including for robbery with a firearm and multiple thefts.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

193.   SJPD officers did not search the brothers for weapons, and Officer Williams testified at trial that even if he had found a knife, he would not have collected it or put it into evidence.

194.   In closing arguments, DDA Judy Lee tried to change her theory of the case after hearing JOHNSON's compelling self-defense testimony and she told the jury "if he's such a sharpshooter, he could have shot the knife out of his hand.  Or better yet, pistol-whipped him."

195.   After three weeks of evidence, the jury began to deliberate in the late afternoon.  Late the next morning, JOHNSON's parents got a call from Bowman that a verdict had been reached and would be read shortly.  They raced from their AirBnb rental to the courthouse. Ms. Johnson, resolute in her faith in her son's innocence, had pre-printed note cards thanking the jurors for their time, with her email address in case they wanted to contact her, and 12 copies of Bryan Stevenson's book Just Mercy.

196.   As the jurors filed into the jury box to render their verdict, they seemed happy and upbeat.

197.   After hearing all of the evidence during the three-week trial, the jury took only hours to acquit JOHNSON on the attempted murders and found him guilty of only a misdemeanor cocaine charge for having a personal use amount of cocaine on his nightstand when the police searched his apartment.

198.   After the verdict was read, JOHNSON's father broke down crying with relief. JOHNSON and his attorney of more than three years consoled each other.

199.   The jurors exited the courtroom after the acquittal, and a group of them stayed to speak to JOHNSON's parents and the DDA in the hallway, including the foreperson, an alternate juror and Juror No. 2.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

200.  Juror No. 2 told Ms. Johnson that he was very sick, has had over 100 blood transfusions and has to use a cane, and throughout the trial did not know if he could hang in there, but he could not live with himself if there was a mistrial.

201.  Juror No. 2 said he could barely hold it together when he saw father crying after the verdict.

202.  The alternate juror was pregnant and frequently felt sick, but felt she needed to stick it out in case she was needed to see this out.

203.  Four jurors waited and talked to DDA Judy Lee.  The foreperson, a young woman named Megan told DDA Lee "you didn't prove anything."  Megan also said that the jury did not believe the officers.

204.  The jurors asked DDA Lee about bail amount. The whole jury wanted to know why JOHNSON was not out on bail.  Lee would not answer.

205.  About three weeks after the acquittal, Juror No. 2 called Ms. Johnson.  He wanted to know how the family was doing, and make sure everything was ok.  He said that he thought it was really a shame they had to go through that.  He asked again why JOHNSON was not out on bail.

**JOHNSON Continued to be Subjected to Harassment from Correctional Staff.**

206.  After acquittal, JOHNSON's parents thought he would go home with them, but instead he was chained up by the courtroom deputies and transported back to jail to be "processed out."

207.  JOHNSON's parents walked down the block to the jail in the early afternoon and asked about JOHNSON's release.  They were told that they would get a phone call from him when he was released to the lobby and ready to be picked up.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

208.  Back in the jail, JOHNSON was put into a cell and told that he may have to be quarantined for five days because of the flu, even though he was not sick.  This unknown DOE defendant will be named as one of the DOES 1-25 when the deputies identify is ascertained.

209.  JOHNSON was housed back in his old cell for six hours before he was finally released.

210.  The Johnsons waited at their Airbnb for over six hours until finally around 10:30pm they got a call from JOHNSON that he was in the jail lobby.

211.  The following day JOHNSON and his mother went to the jail to retrieve his suits that his parents had specially purchased for trial considering his 6'4" frame.

212.  An unknown Doe at the jail refused to return JOHNSON's suits or shoes to him even though his name and jail ID number was on the tag and they had been removed mere hours later.  This presently unknown Doe defendant will be named as one of the DOES 1-25 when the deputies identify is ascertained.

213.  Despite having put in applications on multiple occasions during his incarceration for SSI/SSDI so that he could receive seamless services upon his release, the COUNTY failed to process the application, advising JOHNSON to "resubmit once he is sentenced and has a release date."

214.  This result is due to the COUNTY not having a policy recognizing the presumed innocence of pretrial detainees and failing to have a discharge plan for those who are acquitted and abruptly released.

215.  For this reason, JOHNSON was not given a prescription for his medications as he was released, leaving him to wait until he was able to see a provider on the outside and obtain a prescription, another break in the medications used to treat his mental health conditions.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

**The Unconstitutional Policies, Training and Supervision of the City of San Jose**

216. At all times relevant to this action, Defendants MONZON's, HALL's, TESSLER's, and DOES 26-50's actions were negligent, reckless, wanton, willful, knowing, intentional, unreasonable, extreme, outrageous, and deliberately indifferent to the constitutional rights of JOHNSON.

217. Defendants MONZON, HALL, TESSLER and DOES 26-50's unconstitutional actions violated clearly established law.

218. At the time Defendants MONZON, HALL, TESSLER and DOES 26-50 violated JOHNSON's constitutional rights, the City of San Jose's policies, practices or customs did not require Defendants MONZON, HALL, TESSLER and DOES 26-50 to timely inform JOHNSON's defense counsel or the prosecutors of the existence of exculpatory evidence in the audio recorded interviews of the Castro brothers, the loss and/or destruction of the audio recorded interviews, or the fact that the prosecuting officers no longer had probable cause to detain or prosecute JOHNSON.

219. At the time of Defendants MONZON, HALL, TESSLER, and DOES 26-50 violations of JOHNSON's constitutional rights, the City of San Jose failed to adequately supervise and train Defendants MONZON, HALL, TESSLER, and DOES 26-50 to timely inform JOHNSON's defense counsel and/or the prosecutors of the existence of exculpatory evidence in the audio recorded interviews of the Castro brothers, the loss and/or destruction of the audio recorded interviews, or the fact that the prosecuting officers no longer had probable cause to detain or prosecute a criminal defendant.

220. The City of San Jose's unconstitutional policies, non-existent and/or inadequate training and supervision of Defendants MONZON, HALL, TESSLER, and DOES 26-50 was evidence

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

of the City's deliberate indifference to the constitutional rights of JOHNSON and citizens similarly situated, to be free from corrupt violations of due process and other constitutional rights, and the policies and non-existent or inadequate training were the moving force behind MONZON's, HALL's, TESSLER's, and DOES 26-50's violations of JOHNSON's constitutional rights.

221.   City of San Jose was on notice of this type of conduct because a SJPD detective had conducted a recorded interview of a percipient witness in the investigation of Rudolph Cuevas as a suspect in an attempted homicide, and after the interview claimed to have dropped his recording device which miraculously deleted the audio file, but left the recording device in working order so he was able to record another witness statement 45 minutes later.  This is due to a culture of acceptability of officers recording a statement and if it is inconsistent or inaccurate, deleting that statement, educating the witness and curing the statement.

## DAMAGES

222.   As a proximate result of Defendants' conduct, JOHNSON suffered severe pain and physical injuries. As a further proximate result of Defendants' conduct, JOHNSON suffered severe emotional and mental distress, including but not limited to fear, terror, anxiety, depression, humiliation, public embarrassment, and loss of his sense of security, dignity, and pride, as well as an irremediable distrust of authority figures.  His physical symptoms included sleeplessness, diet disturbance, night terrors, bruises, swelling, pain and discomfort.

223.   As a further proximate result of defendants' conduct, JOHNSON will lose future income in an amount according to proof at time of trial and require further mental health counseling and/or psychological therapies and medications.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

224.  The conduct of the individual Defendants was malicious, sadistic, wanton, and oppressive, and undertaken with malice and/or reckless disregard for the rights and dignity of JOHNSON.  JOHNSON is therefore entitled to award of punitive damages against the individual non-entity Defendants in an amount according to proof at time of trial.

**CLAIMS FOR RELIEF**

**First Cause of Action**
**(Fourteenth Amendment – Cruel and Unusual Punishment, 42 U.S.C § 1983)**
**(Against Defendants RUBAN, MATTHEW REEVES, LUBRIN, and DOES 1-25)**

225.  Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

226.  In doing the acts complained of herein, Defendants RUBAN, MATTHEW REEVES, LUBRIN, and DOES 1-25, acted under the color of the law to violate JOHNSON's basic human dignity and his right to be free from cruel and unusual conditions under the Fourteenth Amendment to the United States Constitution, including the right to be free from the use of excessive force by correctional deputies and other government actors.

227.  As a proximate result of defendants' malicious and sadistic conduct, JOHNSON suffered injuries and damages as set forth in paragraphs 222-223.  The punitive damage allegations of paragraph 224 apply in this Claim for Relief to all individually-named Defendants.

**Second Cause of Action**
**(Fourteenth Amendment – Cruel and Unusual Punishment, 42 U.S.C. §1983 - *Monell* Liability)**
**(JOHNSON Against Defendant COUNTY)**

228.  Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

229.  From the time JOHNSON was booked into County jail in November 2014 until he was acquitted and released on February 7, 2018, he was a pretrial detainee whose conditions of confinement amounted to punishment in violation of the Due Process Clause of the Fourteenth Amendment.

230.  The COUNTY, by and through its supervisory officials and employees, has been given notice on repeated occasions numbering in the thousands prior to the excessive force used on JOHNSON, of a pattern of ongoing constitutional violations and practices by the individually-named Defendants herein and other correctional deputies employed at the COUNTY Main Jail and other jails in the COUNTY jail system, including having received notice regarding the use of excessive force, and cruel and unusual punishment under the Fourteenth Amendment to the United States Constitution.

231.  These policies and practices have been and continue to be implemented by Defendants, such as the harassment and excessive use of force suffered by JOHNSON at the hands of RUBAN, MATTHEW REEVES, LUBRIN, and DOES 1-25, are the proximate cause of the Plaintiff's ongoing deprivation of rights secured under the Fourteenth Amendment.  The force used by RUBAN, MATTHEW REEVES, and DOES 1-25 was not a good faith effort to maintain or restore order but was applied maliciously and sadistically for the very purpose of causing harm.

232.  COUNTY, by its policy and practice of isolating people in inhumane conditions referenced above, is subjecting individuals, including Plaintiff, to serious psychological and physiological harm.  Jail officials have consistently denied or ignored Plaintiff's and others written requests to be removed from isolation or to have access to at least the minimum out of

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

cell time guaranteed by law. This amounts to a serious deprivation of the minimal civilized measures of life's necessities.

233.  Despite said notice, Defendant COUNTY has demonstrated deliberate indifference to this pattern and practice of constitutional violations, having shown deliberate indifference, by failing to take necessary, appropriate, and/or adequate measures to prevent the continued perpetuation of said pattern of conduct by their employees and agents. This lack of an adequate supervisorial response by Defendant COUNTY demonstrates the existence of an informal custom, policy, or practice, which tolerates and promotes the continued violation of civil rights of inmates by COUNTY's employees and agents.

234.  JOHNSON is informed and believes that in addition to these long-standing practices and customs, the COUNTY has failed to provide adequate training, or no training at all, on the obligations of COUNTY correctional deputies to not engage in excessive force, and to conduct themselves as professionals charged with not only ensuring the completion of an inmate's criminal sentence, but the safety of inmates as well.

235.  The acts of the individually-identified Defendants alleged herein are the direct and proximate result of the deliberate indifference of Defendant COUNTY and its supervisory officials and employees to violations of the constitutional rights of inmates by the individually-named Defendants and other correctional deputies.

236.  The COUNTY has failed to adequately seek out or stop such sadistic behavior as alleged herein by failing to investigate claims of excessive force, and further failing to adequately discipline, punish, or expel correctional deputies who have engaged in the aforementioned and/or similar conduct when handling inmates.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

237.  The COUNTY has either provided no training at all in regards to appropriate handling, treatment, and protection of inmates, or has received wholly inadequate training with no measurable standards, or no measuring, of the training recipients understanding, retention, and application – or non-application – of training materials and subject matter.

238.  JOHNSON's injuries were a foreseeable and a proximate result of the deliberate indifference of the COUNTY to the constitutional violations taking place in the COUNTY Main Jail and jail system, existing as a result of the patterns, practices, customs and/or policies, and/or lack of training or non-existent training, described above.

239.  As a proximate result of COUNTY's conduct and omissions, JOHNSON suffered injuries and damages as set forth in paragraphs 222-223.  The punitive damage allegations of paragraph 224 apply in this Claim for Relief.

**Third Cause of Action**
**(Intentional Infliction of Emotional Distress - Conspiracy between RUBAN, MATTHEW REEVES, and DOMINGUEZ)**

240.  Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

241.  The conduct of Defendants RUBAN, MATTHEW REEVES, and DOMINGUEZ as set forth herein, was extreme and outrageous and beyond the scope of conduct which should be tolerated by citizens in a democratic and civilized society.  In order to deliberately injure, intimidate and harass JOHNSON and other similarly situated prisoners who are disabled or file administrative grievances, Defendants committed the aforementioned extreme and outrageous acts with the intent to inflict severe mental and emotional distress upon JOHNSON and convey fear and intimidation to JOHNSON and the other inmates.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

242.  As a proximate result of Defendants' willful, intentional and malicious conspiratorial conduct, JOHNSON suffered severe and extreme mental and emotional distress.

243.  As a proximate result of Defendants' wrongful conduct, JOHNSON suffered injuries and damages as set forth in paragraphs 222-223.  The punitive damage allegations of paragraph 224 apply in this Claim for Relief to all individually-named Defendants.

244.  Since the conduct of Defendants RUBAN, MATTHEW REEVES, and DOMINGUEZ and the injuries to JOHNSON that they inflicted, occurred in the course and scope of their employment, Defendant COUNTY is therefore liable to JOHNSON pursuant to *respondeat superior*.

**Fourth Cause of Action**
**(California Civil Code § 52.1)**
**(Against Defendants RUBAN, MATTHEW REEVES, LUBRIN, DOES 1-25 and COUNTY)**

245.  Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

246.  The conduct of Defendants RUBAN, MATTHEW REEVES, LUBRIN, and DOES 1-25 as described herein violated California Civil Code § 52.1, in that they interfered with JOHNSON's exercise and enjoyment of his civil rights, as enumerated above, through excessive force, as well as the conduct constituting cruel and unusual punishment upon JOHNSON.

247.  As a direct and proximate result of Defendants' violation of Civil Code § 52.1, JOHNSON suffered violation of his State and Federal constitutional rights, and suffered damages as set forth in paragraphs 222-223.  The punitive damage allegations of paragraph 224 apply in this Claim for Relief to all individually-named Defendants.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

248.  Since the conduct of Defendants RUBAN, MATTHEW REEVES, LUBRIN, and DOES 1-25 occurred in the course and scope of their employment, Defendant COUNTY is therefore liable to JOHNSON pursuant to *respondeat superior*.

**Fifth Cause of Action**
**(Americans with Disabilities Act, 42 U.S.C. § 12101, et seq.)**
**(Against COUNTY)**

249.  Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

250.  Plaintiff JOHNSON is a qualified individual with a disability as defined in the ADA. He has mental impairments that substantially limit one or more major life activities, he has a record of such impairments, and is regarded as having such impairments. 42 U.S.C. § 12102(2); 42 U.S.C. § 12131(2).

251.  Defendant is a public entity as defined under 42 U.S.C. § 12131(1)(A).

252.  A public entity must "administer services, programs, and activities in the most integrated setting appropriate to" an individual's needs and is therefore prohibited from unnecessarily segregating or isolating the individual. 28 U.S.C. § 35.130(d).

253.  Defendant violated the ADA by failing to ensure that JOHNSON had access to, was permitted to participate in, and is not denied the benefits of programs, services, and activities. 42 U.S.C. § 12132; 28 C.F.R. § 35.152(b)(1).

254.  Defendant violated the ADA by failing to make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability…" 28 C.F.R. § 35.130(b)(7).

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

255.   Defendant violated the ADA by failing to "ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals." 28 C.F.R. § 35.152(b)(2).

256.   Plaintiff JOHNSON did not pose a direct threat to others and housing him in unduly restrictive confinement is not a legitimate safety requirement necessary for the safe operation of services, programs, or activities. 28 C.F.R. § 35.139.

**Sixth Cause of Action**
**(Section 504 of the Rehabilitation Act)**
**(Against COUNTY)**

257.   Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

258.   Plaintiff JOHNSON is a qualified individual with a disability as defined in Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

259.   Defendant receives federal funding within the meaning of the Rehabilitation Act.

260.   Defendant violated Section 504 of the Rehabilitation Act by discriminating against JOHNSON and other prisoners with psychiatric and intellectual disabilities solely on the basis of their disabilities. 29 U.S.C. § 794.

261.   Defendant violated Section 504 of the Rehabilitation Act by failing to reasonably accommodate JOHNSON and his disabilities in its facilities, programs, activities and services.

262.   Defendant's policy and practice of discriminating against people with disabilities in the use of restrictive housing is not reasonably related to legitimate penological interests because (1) it worsens their psychiatric and physical conditions; (2) there are no alternative means for them to access programs, services, and activities; (3) there are alternative means to safely and

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

cost-effectively house them in the jails; and (4) it is an exaggerated response as they do not require restrictive housing on the basis of their disabilities.

### Seventh Cause of Action
**(Fourth and Fourteenth Amendments – Continued Unlawful Detention, Malicious Prosecution, 42 U.S.C § 1983)**
**(Against Defendants MARCO MONZON; JAMIE LEE NICHOLAS HALL; TRENT TESSLER, and DOES 1-25)**

263.  Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

264.  In doing the acts complained of herein, Defendants MARCO MONZON; JAMIE LEE NICHOLAS HALL; TRENT TESSLER and DOES 1-25, acted under the color of the law to violate JOHNSON's basic human dignity and his right to be free from unreasonable seizures under the Fourth and Fourteenth Amendment to the United States Constitution, including the right to be free from continued unlawful detention by police and other government actors.

265.  As a proximate result of defendants' malicious and sadistic conduct, JOHNSON suffered injuries and damages as set forth in paragraphs 222-223.  The punitive damage allegations of paragraph 224 apply in this Claim for Relief to all individually-named Defendants.

### Eighth Cause of Action
**(Fourth and Fourteenth Amendments – Continued Unlawful Detention, Malicious Prosecution, 42 U.S.C § 1983- *Monell* Liability)**
**(JOHNSON Against Defendant CITY)**

266.  Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

267.  From the time JOHNSON was arrested in November 2014 until he was acquitted and released on February 7, 2018, he was unlawfully detained in violation of the Fourth Amendment and the Due Process Clause of the Fourteenth Amendment.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

268.   The CITY, by and through its supervisory officials and employees, has been given notice on repeated occasions numbering in the thousands prior to the continued unlawful detention of JOHNSON, of a pattern of ongoing constitutional violations and practices by the individually-named Defendants herein and other police officers employed with the CITY, including having received notice regarding the destruction of evidence, unlawful seizures and continued unlawful detentions under the Fourth and Fourteenth Amendments to the United States Constitution.

269.   These policies and practices have been and continue to be implemented by Defendants, such as the destruction of evidence and continued unlawful detention suffered by JOHNSON at the hands of MARCO MONZON; JAMIE LEE NICHOLAS HALL; TRENT TESSLER and DOES 1-25, are the proximate cause of the Plaintiff's ongoing deprivation of rights secured under the Fourth and Fourteenth Amendments.  The conduct of MARCO MONZON, JAMIE LEE NICHOLAS HALL, TRENT TESSLER and DOES 1-25 was not a good faith effort to investigate but was a malicious prosecution and continued unlawful detention.

270.   Despite said notice, Defendant CITY has demonstrated deliberate indifference to this pattern and practice of constitutional violations, having shown deliberate indifference, by failing to take necessary, appropriate, and/or adequate measures to prevent the continued perpetuation of said pattern of conduct by their employees and agents. This lack of an adequate supervisorial response by Defendant CITY demonstrates the existence of an informal custom, policy, or practice, which tolerates and promotes the continued violation of civil rights of criminal defendants by CITY's employees and agents.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

271.  JOHNSON is informed and believes that in addition to these long-standing practices and customs, the CITY has failed to provide adequate training, or no training at all, on the obligations of CITY police officers to preserve and turn over exculpatory evidence.

272.  The acts of the individually-identified Defendants alleged herein are the direct and proximate result of the deliberate indifference of Defendant CITY and its supervisory officials and employees to violations of the constitutional rights of criminal defendants by the individually-named Defendants and other police officers.

273.  The CITY has failed to adequately seek out or stop such sadistic behavior as alleged herein by failing to investigate claims of destruction of evidence, and further failing to adequately discipline, punish, or expel police officers who have engaged in the aforementioned and/or similar conduct when handling evidence.

274.  The CITY has either provided no training at all in regards to appropriate handling of evidence, or has received wholly inadequate training with no measurable standards, or no measuring, of the training recipients understanding, retention, and application – or non-application – of training materials and subject matter.

275.  JOHNSON's injuries were a foreseeable and a proximate result of the deliberate indifference of the CITY to the constitutional violations taking place in CITY police department, existing as a result of the patterns, practices, customs and/or policies, and/or lack of training or non-existent training, described above.

276.  As a proximate result of CITY's conduct and omissions, JOHNSON suffered injuries and damages as set forth in paragraphs 222-223.  The punitive damage allegations of paragraph 224 apply in this Claim for Relief.

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

**CLAIM REQUIREMENT**

277.  JOHNSON is no longer in custody and files this complaint free of the strictures of Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a).

278.  JOHNSON is required to comply with an administrative claim requirement under California law in order to make claims based on state law.  JOHNSON has complied with all applicable requirements and submitted timely Government Tort Claim Notices pursuant to G.C. 910, et seq., which has been rejected either in writing, or by operation of law, by the COUNTY and CITY.

**PRAYER FOR RELIEF**,

WHEREFORE, Plaintiff respectfully request that this Court:

1.)     Award Plaintiff general, special and compensatory damages in an amount to be proven at trial.

2.)     Award Plaintiff punitive damages against individually named Defendants, and each of them, for their extreme and outrageous conduct in complete disregard for the rights of the Plaintiff;

3.) Award Plaintiff statutory damages and/or attorney's fees against all Defendants as allowed by 42 U.S.C. §1988.

4.) Award Plaintiff statutory damages and/or attorney's fees against all Defendants as allowed by Title I and II of the ADA and Sections 501 and 504 of the Rehabilitation Act.

5.) Grant Plaintiff such other and further relief as the Court deems just and proper.


Dated: October 11, 2018                     _/S/ Sarah E. Marinho_
                                            SARAH E. MARINHO
                                            Attorney for Plaintiff

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.

JURY DEMAND:  Plaintiff demands a trial by jury in this matter, pursuant to FRCP 38(a).


Dated: October 11, 2018                                          /S/ Sarah E. Marinho
                                                                SARAH E. MARINHO
                                                                Attorney for Plaintiff

Complaint for Violation of Civil Rights
Jury Trial Demanded
Andrew Johnson v. County of Santa Clara, et al.